BURNHAM, Intervener, Respondent, vs. BARTH, Receiver, Appellant.

*January 9 — February 5, 1895.*

*Equity: Following trust fund: Insolvent bank: Priority of payment.*

1. The beneficiary or owner of a trust fund cannot regain it out of the estate of an insolvent trustee unless it can be identified or traced into some specific substituted property.

2. Moneys belonging to infants were deposited to the credit of their guardian, as such, in a bank which was then, to the knowledge of its officers, insolvent. From that time until the bank suspended payment the deposits therein and the payments to depositors and for other debts and expenses were about equal, and during that period the bank also made loans upon securities. When the bank suspended the securities passed to the receiver, but there was little money left. The moneys of the infants so deposited were not shown to have been paid out to depositors or other creditors or for expenses, nor could they be traced into the said securities or any part thereof. Other similar trust funds deposited in the bank amounted to more than the sum represented by said securities. *Held,* that it could not be presumed that the securities represented the particular trust fund belonging to said infants, and that therefore their claim stands upon the same basis as the claims of general creditors.

APPEAL from a judgment of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Reversed.*

An action was commenced July 24, 1893, against the South Side Savings Bank, a banking corporation, for the purpose of winding up its affairs, on account of its insolvency, pursuant to the statute in such case made and provided; and *John Barth*, the appellant, was appointed receiver of the bank. October 12, 1893, *John Q. Burnham*, petitioner and respondent, filed an intervening petition in the action, as the general guardian of the minor children and heirs at law of Thomas Stearns, deceased, claiming a lien upon the assets of the bank in the hands of the receiver for a trust fund belonging to said minors, to the amount of $11,213.19, which had been deposited in the bank by their special guardian, John B. Koetting, and wrongfully converted by the bank.

A trial was had upon issue joined before a referee, and from his report the following facts appear, in substance: In June, 1892, Koetting, as special guardian of the minors, was directed by the circuit court to retain the sum of $11,316.96, the amount of their interest in the purchase money of certain real estate then recently sold by order of the court, secured by a note and mortgage, until a general guardian should be appointed for them, when he was to pay it over to their general guardian, now the petitioner. Between the 30th of July and the 26th of October, 1892, Koetting collected the amount of the mortgage, being $11,469.06, and deposited the moneys in the South Side Savings Bank, and they were mingled with other funds of the bank; the bank issuing to said Koetting, as such special guardian, certificates of deposit therefor, which were made out by him as cashier of the bank. On February 14, 1893, Koetting caused said certificates to be surrendered, and caused the amount thereof, together with $163.41, interest to that date, to be entered and credited to his account as guardian, on the savings department ledger of the bank. Afterwards said bank paid upon checks of said Koetting, as guardian, $602.94, which was debited to the said account, and July 15,

1893, there was credited to said account $183.66 for inter-
est; so that at the time of the suspension of the bank, July
21, 1893, there was a net credit on said account of $11,213.19.
When Koetting received the first of said moneys so depos-
ited by him the bank was insolvent, and so remained until
its failure, and such insolvency was at all times well known
to the officers of said bank, namely, Gustav C. Trumpff, the
president, and Koetting, the cashier. They each owned one
half of the capital stock, and were the directors of the
bank; and Koetting, as cashier, had exclusive management
and control of the moneys of the bank, and kept its general
ledger, and mingled the money of the said minors with the
general funds of the bank as aforesaid. Between the 30th
of July, 1892, and the 23d of July, 1893, the bank conducted
a general banking business, during which period it received
in the neighborhood of $500,000 and upwards in deposits,
and paid out in the neighborhood of $500,000 and upwards
to depositors and in the payment of other debts and expenses
of the bank. During the same period it loaned, upon se-
curities and otherwise, upwards of $25,000, only $15,000 of
which were made after it received the moneys in question,
and these securities passed to the receiver. At the time of
the suspension of the bank and the appointment of a re-
ceiver there was less than $1,600 of money in the bank,
namely, $1,109.55, consisting of old and mutilated gold and
silver coins in United States currency, and the balance of
foreign gold and silver and paper money. The amounts
then due from the bank to city and town treasurers for
moneys deposited by them as such was upwards of $800,000,
and the amount due from it to executors, guardians, and
other trustees for moneys claimed by them to have been
deposited by them as such, and the payment of which in
full is claimed by them, was about $60,000. Claims had
been filed by the general creditors of said bank for moneys
deposited aggregating over $1,200,000, and the time to file

Burnham vs. Barth.

·claims had not then expired. During the last five days of its active existence the bank disbursed in money $69,000 more than it received during the same time. It had been insolvent, when it failed, to the knowledge of its officers for more than six years, and the nominal value of its assets was $1,185,177.92, and their actual value several hundred thousand dollars less. Its liabilities were $1,587,553.79. The moneys of said minors, so received by the bank, had not been traced into any specific part or portion of the collaterals or securities which so passed into the hands of the receiver, and the identical moneys so received by Koetting as guardian had not been, and could not be, traced to said collaterals or any part thereof. Said trust funds were not proven to have been dissipated or squandered by the said bank, or to have been used in the payment of its depositors, ·or in the payment of other creditors or of the expenses of the bank.

As conclusions of law, the referee found that these facts justified the assumption that the trust funds of said infants, so received by the bank and mingled with its own money, were by it invested in, and formed a part of, the collaterals and securities in the hands of the receiver, and that the petitioner, as their general guardian, was entitled to a lien upon said collaterals and securities to the amount of $11,213.19, and to have that sum paid to him from the proceeds thereof, if sufficient for that purpose. Judgment was ·entered accordingly, in favor of the petitioner and against the said receiver as such, and from which the receiver appealed.

For the appellant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *J. G. Flanders.*

For the respondent there was a brief by *Somers & Dorr,* and oral argument by *T. H. Dorr.* They contended, *inter alia,* that the fund belonging to the infants had been sufficiently traced to warrant a recovery. *Slater v. Oriental*

*Mills,* 27 Atl. Rep. 443; *In re Cavin v. Gleason,* 105 N. Y. 262–3; *Independent Dist. of Boyer v. King,* 80 Iowa, 497; *District Tp. of Eureka v. Farmers' Bank,* 55 N. W. Rep. 342; *Carley v. Graves,* 85 Mich. 483.    Quoting from the report of the referee: " There can be no question but that the bank became by its wrongful act the trustee of the money belonging to the infants in this case.    And if the courts, in a case where a trustee mingles trust funds with his own money at his bank and afterwards draws from his general account, will assume that the money drawn out was the individual money of the trustee in preference to the trust money, by analogy it is only just and equitable in a case like the one at bar to assume that the money paid out by the defendant bank to depositors and for expenses after the receipt of the trust money in question was its own money, and that the moneys invested or loaned upon collateral or security remaining in the bank at the time of its failure, or enough of it to meet the claim of the petitioner here, was the money of these infants."

PINNEY, J.    Since the decision of this court in the case of *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237, and *In re Plankinton Bank,* 87 Wis. 385, it must be regarded as settled, in this state at least, that, in order that the beneficiary or owner of a trust fund may be able to regain it out of the estate of a defaulting and insolvent trustee, he must be able to trace it into, and satisfactorily identify it in, the hands of the assignee or receiver of his estate, or its substitute or substantial equivalent; that when the trust fund has been dissipated, or so confounded and mixed up with the property and estate of the trustee that it cannot be traced or identified, there remains nothing to be the subject of the trust, and the owner of the fund or property is not entitled to prove for it as a trust debt and obtain a preference over the other creditors of the insolvent estate out of the prop-

erty to which no part of the trust fund or property or proceeds of it is traceable. The right to so trace trust funds and regain them has, it is held, its basis in the right of property. In *Thuemmler v. Barth, post,* p. 381, the rule laid down in the former cases was reaffirmed and applied. When the trust fund cannot be identified or traced into some specific estate or substituted property, and the means of ascertainment fail, the trust wholly fails, and the party can only prove as a general creditor.

The court held that the facts stated warranted the assumption that the trust fund in question had been invested by the bank in, and formed a part of, the collaterals and securities in the hands of the receiver, but what particular collaterals or securities of those received by him is not indicated. And it is upon this ground that the judgment against the receiver as such, appealed from, has been rendered. Instead of requiring the petitioner to ascertain and identify the trust fund as existing in some specific changed or substituted property or estate, the judgment makes the claim of the petitioner a trust debt or preferred demand against all the collaterals and securities which came to the hands of the receiver, whether taken before or after the deposit of the fund claimed, notwithstanding the fact that very many others are entitled to claim, as we have seen, very large sums, and to trace the same into the same collaterals and securities, so far as they may be able; and some of them may succeed, perhaps, in making the necessary proof for that purpose. There is quite as much to justify the conclusion that the fund in question was paid out to creditors of the bank as that it was invested in collaterals or securities which came to the hands of the receiver; and if it had been so paid out, that fact would afford no ground for charging the assets of the bank with the debt as a trust demand or preferred claim, as was clearly shown in *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237.

The judgment appealed from rests upon the ground that it is to be presumed that the bank paid its creditors and its expenses out of its own money, and that its investments in the securities and collaterals represent only *this* particular trust fund, rather than the large amount of other claims of like character. It may well be that others having such claims may succeed in tracing their trust funds into these identical securities; and in that event it may transpire that the court, by its judgment, has awarded to the petitioner, without definite proof of ownership, that which in equity really belongs to others. The court had nothing before it to show that such was not the case. If the several trust funds had been in a deposit box of the bank, with funds of others, but in one gross sum or mass, when the suspension occurred, there could be no difficulty in awarding to each his own; but none of the trust funds remained. When a trustee mingles trust money with his own, in a bag or box or bank account, the right of the beneficiary attaches, to have all that belongs to him out of the bag, box, or account, and whatever the trustee may take out will be deemed or presumed to have been taken from his own, instead of the trust, funds; but when the money in the bag, box, or account has all been drawn out, and there is no evidence to show what has been done with it, or with the trust portion of it, there is no presumption that the trust funds, to any extent, are included or represented in securities, the legal title to which is vested in the bank. The presumption that the trustee has paid out only his own funds in no way qualifies the rule that there must be a specific thing, capable of being followed.

If the trust funds which the bank had, had been invested by it from time to time in various city lots or farms, the title to which had been taken in the name of the bank, and the owner of a part of such funds assumed to ratify the act by which his money had been invested, as he well might,

and claim the property purchased with it, or to repudiate it and enforce a claim for his money against the land so purchased with it, it seems plain that he could not do either unless he could show what particular part of such real estate had been purchased in whole or in part by, and represented, his money; and, not being able to do this, it is clearly impossible to maintain that without such proof he could exercise either of these rights against and in respect to all the lands generally, so purchased from time to time with the trust funds owned by himself and by others. In like manner, in respect to these securities, there is no evidence to show whether any of the moneys claimed by the petitioner were invested in them or in any particular part of them; and as the right to trace his trust fund is founded on the right of property, and not on the ground of compensation for its loss, he must be able to point out the particular property into which the fund has been converted. When he is unable to do this, the trust fails and his claim becomes one for compensation only, for the loss of the fund, and stands on the same basis as the claims of general creditors.

The rule in the administration of insolvent estates is that equality is equity, and the burden of proof is on the claimant to show the facts which entitle him to claim as owner and not merely as a creditor. The receiver represents all the creditors, in a general sense; and the presumption, in the absence of proof, as between different claimants is in favor of equality of right. The petitioner has shown no facts entitling him to the securities in question to the exclusion of other owners of trust funds similarly situated. While the owners of one or more trust funds may trace their money into specific property purchased with them, or it may be in part with them and funds of the trustee, each party, in order to assert and enforce his equitable rights as owner, can do so only upon proof of the amount contributed

Burnham vs. Barth.

by each, of their respective funds, in the purchase. Each claimant is entitled to his own, but only upon clearly identifying it; and, failing to do this, he cannot be allowed to take property which equitably belongs to others, to make himself whole. He cannot maintain his position as owner by merely showing facts which entitle him to the position of a mere creditor.

The subject under consideration is discussed with great clearness and ability in the case of *Slater v. Oriental Mills,* (R. I.) 27 Atl. Rep. 443, and the reasoning there adopted seems to be conclusive against the petitioner's case. The court will go as far as it can in tracing and following trust money, but when, as a matter of fact, it cannot be traced, the trust and equitable right of the beneficiary to follow it fails. Under such circumstances, if the trustee has become insolvent, the court cannot presume, in the absence of proof, that the trust money is to be found somewhere in the general estate of the trustee, or somewhere in a quite general part of his estate of a certain character that still remains, and proceed to charge it accordingly. *Little v. Chadwick*, 151 Mass. 110. And where the trust fund, as in this case, cannot be traced, and the substituted property into which it has entered specifically identified, the trust fund must be regarded as dissipated, within the meaning of the authorities,— scattered, dispersed, and, as such, destroyed. And this is the logical result of the case of *Nonotuck Silk Co. v. Flanders*, 87 Wis. 237, and other subsequent cases in this court. This is in harmony with the great weight of modern authority. *Freiberg v. Stoddard*, 161 Pa. St. 259; *In re Cavin v. Gleason*, 105 N. Y. 256; *Philadelphia Nat. Bank v. Dowd*, 38 Fed. Rep. 172; *National Bank v. Insurance Co.* 104 U. S. 54; *Cecil Nat. Bank v. Thurber*, 8 C. C. A. 365; *Ex parte Hardcastle*, 44 Law T. (N. S.), 524; *In re Hallett & Co., Ex parte Blane*, [1894] 2 Q. B. Div. 237.

Block vs. Milwaukee Street R. Co.

For these reasons, we hold that the petitioner wholly failed to show himself entitled to the judgment he obtained.

*By the Court.*— The judgment of the superior court is reversed, and the cause is remanded for further proceedings according to law.