METROPOLITAN NAT. BANK OF KANSAS CITY, MO., v. CAMPBELL COMMISSION CO. (GREGORY, Intervener).

(Circuit Court, W. D. Missouri, W. D.   December 12, 1896.)

FOLLOWING TRUST FUND—LIMITATION OF RULE.

The rule permitting the owner of a fund, which has been misappropriated by one who held it in trust or for a specific purpose, to follow the trust property in the hands of the trustee, or of a receiver, in case of insolvency, does not extend beyond permitting such owner to pursue the fund in kind, or in specific property into which it has been converted, or, if the fund has been mingled with the trustee's other property, to establish a charge on the mass of such property for the amount of such fund, and it does not give to the owner of such fund any rights, in preference to other creditors of the trustee, in property into which the trust fund has in no way entered. Bank v. Latimer, 67 Fed. 27, reaffirmed.

Francis M. Black, for intervener.
Geo. A. Neal, for receivers.

PHILIPS, District Judge. The question to be decided arises on exceptions filed by the intervener, Gregory, to the master's report denying to intervener a right of preference to the general assets in the hands of the receivers, except as to the sum of $121.27 in money on hand at the time the receivers took charge of the estate.

The controversy arose out of substantially the following state of facts: The Campbell Commission Company advanced to the intervener large sums of money for the purchase of cattle and hogs, to be sold through the Campbell Commission Company, to secure which Gregory executed the company chattel mortgages on all the cattle purchased and fed by him under said arrangement. Among the notes thus secured was one for $5,000. Within a few weeks before the failure of the company and appointment of the receivers, Gregory made a consignment of cattle to the company, to be sold with the understanding that the proceeds thereof were to be applied to the liquidation of said $5,000 note. The amount realized out of these cattle by the company was $6,473.69. Instead of applying the same to the satisfaction of said $5,000 note, the company paid thereof the sum of $3,818.55 to one Hall (to whom it owed, for moneys advanced, the sum of $9,064.23) within a few days before the appointment of a receiver. The balance of this fund was otherwise paid out and dissipated, until only the sum of $121.27 was found on hand when the receivers took possession of the assets of the company. This company had offices at Chicago, St. Louis, Omaha, and Kansas City, with various contracts and transactions had at each of these offices in the handling and selling of cattle under arrangements with parties to whom moneys had been advanced, and with whom contracts had been made for the sale of such stock on commission. The transaction in question was had with the Chicago office. The only property which came into the hands of the receivers at the Chicago office consisted of office furniture and some small outstanding accounts, which aggregated $984.12. The receivers have realized on office furniture and fixtures at all the points aforesaid, and on other contracts held by the company for commission on cattle, and on the sale of outstanding notes and accounts, the sum of $7,400, as shown by the final report of the master. No part of the money realized by the company on the cattle shipped by Gregory went into the property or assets out of which this sum of $7,400 was realized, with the exception of the said sum of $121.27. The master further finds that, just before the appointment of the receivers, the intervener, on learning of the failure of the company to pay off the $5,000 note, applied to the company at Chicago for protection and security; that upon his insistence the company was persuaded to turn over to him the sum of $2,000 of the moneys on hand in the office at St. Louis, realized from the general business of the company at that point, and also induced the company to turn over to him a large amount of notes and accounts payable to the company, aggregating a sum equal to the balance claimed by the intervener, which sum of $2,000 and notes and accounts he holds, but which notes and accounts are probably of little value. The conclusion on the law of the case, reached by the master, is that the intervener is not entitled, out of this fund, to a preference over other general creditors of the company, except as to said sum of $121.27. To this conclusion the intervener takes exception.

The master, in his conclusions on the law of the case, followed the ruling of this court in Bank v. Latimer, 67 Fed. 27. The essence

of that ruling was that, where A. received a particular fund which in equity belongs to B., with directions to apply it to a specific purpose or to a specified use for B.'s benefit, A. becomes a trustee, by implication, of such fund; and if, in perversion of his trust, he appropriates the fund to his own use, as between him and B., the latter, in addition to his right of action at law as for a conversion or for money had and received, is entitled in equity to pursue the trust fund in kind, if remaining in the hands of the trustee, or the receiver in case of insolvency; and, if not on hand in kind, he can pursue it into any form of property into which it may have been converted; or, if the fund had been mingled with the mass of A.'s other property, so that it was incapable of identification and separation by reason of the confusion, then a court of equity would declare the amount of the trust fund to be a charge upon the mass of the insolvent's estate with which the fund had been blended, to be satisfied in preference to the claims of general creditors. But, if the fund so received by A. had been paid out or disposed of by him at the time of the appointment of the receiver, and no part of it had contributed to the acquisition of the property taken possession of by the receiver, B.'s equity to a preference over other creditors in the remaining assets of the estate was gone. This is assailed by counsel for the intervener, who asserts the broad proposition that the preferential rights of intervener should be carried and applied to any assets in the hands of the receiver, regardless of the fact that the trust fund misappropriated by the debtor in no manner entered into or contributed to the creation of the property coming into the possession of the receiver.

Out of regard to the earnest insistence of the intervener's counsel, as well as the respect entertained for his experience and learning, I have re-examined the grounds of the ruling in Bank v. Latimer. In that case I took as the predicate of the decision the following language from the opinion of Mr. Justice Bradley in Frelinghuysen v. Nugent, 36 Fed. 239:

"Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it, the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase, or sale. But, if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held, as the better doctrine, that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried."

It is true, as suggested by counsel, that the peculiar facts of that case rendered the conclusion of Mr. Justice Bradley on the whole case correct, independent of the postulate above quoted. But this in no degree diminishes the force of his clear declaration that "this is as far as the rule has been carried," and the further statement, made by him, that:

"The difficulty of sustaining the claim in the present case is that it does not appear that the goods claimed were, either in whole or in part, the proceeds of any money unlawfully abstracted from the bank."

Although he proceeded to develop further facts which rendered the contention of the complainant untenable, it affords no ground for discrediting the correctness of the rule of law theretofore asserted. That it cannot be said to have been a mere dictum or abstraction, the rule announced by him was subsequently quoted, approved, and applied by the supreme court in Peters v. Bain, 133 U. S. 693, 10 Sup. Ct. 354. And this doctrine had expressly been recognized and applied by the supreme court in the case of National Bank v. Insurance Co., 104 U. S. 57, in which the chief justice said:

"Purchases made and paid for out of the general mass cannot be claimed by the bank [the cestui que trust] unless it is shown that its own moneys, then in the fund, were appropriated for that purpose."

Such, too, was the view of the law entertained by Mr. Justice Miller. In his opinion in Litchfield v. Ballou, 114 U. S. 195, 5 Sup. Ct. 820, speaking to the point of the right of an equitable creditor pursuing his fund into other property of the debtor, he repudiated the contention of complainant for the reason, inter alia, that:

"There is no evidence that the funds which went to build these works are traceable to their source in any instance."

This precise question, in a similar case in principle, was elaborately considered by the court of appeals in the Ninth circuit, in Spokane County v. First Nat. Bank, 16 C. C. A. 81, 68 Fed. 979, delivered shortly after the decision in Bank v. Latimer. The effort there, as here, was to enforce the trust "against any assets in the hands of the receiver," regardless of the fact that it was not shown by the bill that any of the complainant's money, or any assets thereby procured, ever came into the hands of the receiver; and the same argument there, as here, was made that, nevertheless, the presumption should be indulged that the wrongful application of the trust fund had contributed to the benefit of the estate in the proportion that it had lessened the volume of the general claims against the estate. To this the court said:

"We are unable to assent to the proposition that, because a trust fund has been used by the insolvent in the course of his business, the general creditors of the estate are by that amount benefited, and that therefore equitable considerations require that the owner of the trust fund be paid out of the estate, to their postponement or exclusion. If the trust fund has been dissipated in the transaction of the business before insolvency, it will be impossible to demonstrate that the estate has been thereby increased, or better prepared to meet the demands of creditors; and, even if it is proven that the trust fund has been but recently disbursed, and has been used to pay debts that otherwise would be claims against the estate, there would be manifest inequity in requiring that the money so paid out should be refunded out of the assets, for in so doing the general creditors, whose demands remain unpaid, are in effect contributing to the payment of the creditors whose demands have been extinguished by the trust fund. Both the settled principles of equity and the weight of authority sustain the view that the plaintiff's right to establish his trust and recover his fund must depend upon his ability to prove that his property is, in its original or a substituted form, in the hands of the defendant. Little v. Chadwick, 151 Mass. 109, 23 N. E. 1005; Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504; Association v. Austin (Ala.) 13 South. 908; Shields v. Thomas (Miss.) 14 South. 85; Silk Co. v. Flanders (Wis.) 58 N. W. 383; Slater v. Oriental Mills (R. I.) 27 Atl. 443; Bank v. Armstrong, 39 Fed. 684; Multnomah Co. v. Oregon Nat. Bank, 61 Fed. 912; Massey v. Fisher, 62 Fed. 958."

Mr. Justice White, sitting with the court of appeals in the Fifth circuit in the case of Randolph v. Allen, 19 C. C. A. 369, 73 Fed. 24, speaking to a like question, said:

"There was no attempt at the hearing to establish that all, or any particular portion, of this 1,959 head of cattle were bought with the $30,000, though, as a matter of fact, complainant never repudiated the contract with Hudson, or elected to treat the money obtained by Hudson as fraudulently obtained, and the title to it still in complainant. But, even though complainant had done so, and though it be conceded he had a right to follow the proceeds of that money, he could assert no lien against the property, for other moneys had also been used in the purchase," —citing Litchfield v. Ballou, supra.

The latest federal case on this question is that of Oil Co. v. Hawkins, 20 C. C. A. 468, 74 Fed. 395, which carries the doctrine of equitable restitution out of the general estate of the insolvent in favor of the wronged cestui que trust to the extremest point. The question arose on demurrer to a bill of intervention for preference, which showed that the receiver came into possession of assets constituted in part of the misappropriated fund, and, before the bill was filed, the receiver, on order of the court, had distributed among the general creditors a considerable portion of the assets, leaving in his hands a residue. It was held that, as the proceeds of the trust fund had thus gone to swell the fund distributed by the receiver among the creditors, it was equitable to apply the remaining assets to the satisfaction of the equitable claim, to the exclusion of the general creditors. It is to be observed, of this case, that the trust fund constituted a part of the assets of the insolvent estate which passed into the hands of the receiver. So, notwithstanding the confusion of goods by the trustee, the cestui que trust had the right to have taken from the mass a sum equivalent to his claim, and, when the general creditors had received a distributive share augmented by the contribution of the trust fund to the general assets, they should not complain that they were postponed as to the remainder in favor of the special creditor, whose property in equity they had already shared in. This, evidently, was predicated of the theory, in law, that when the property of the insolvent is taken possession of by the court, it is in custodia legis, held by the receiver in trust for distribution among the creditors as their rights may be made to appear, and therefore, in the final distribution, if the trust fund had hitherto been distributed by order of the court among general creditors, as equality is equity, the remaining fund could be applied to the special creditor to produce such equality of right.

This is the utmost verge to which any adjudication in the federal courts has ever gone, and certainly it all but crosses the danger line which marks the theory on which the rule in question is founded, to wit, that a court of equity proceeds in such cases upon the idea that the property pursued is still the property of the complainant. It partakes something of the nature of a proceeding in rem and the enforcement of an equitable lien. So that, where there is no res upon which the rule is to operate, it should logically follow that the rule should cease to have any application. While some courts, in the eager desire for justice, have carried this rule quite far in

cases strongly appealing for judgment of restitution, as in case of the perversion of school funds, and of guardians, and the like, there is often great danger of forgetting that there is virtue and truth in the maxim that "Hard cases are the quicksands of the law." There is, in all such instances, great danger of the courts drifting entirely away from the fundamental grounds upon which a rule of equity is builded, and getting out upon the wide sea of adventure without chart or compass. While rules and principles of equity jurisprudence are constantly expanding, in the aspiration for justice in the administration of law by courts, they should never forget that "the sprout is to savour of the root, and go the same way."

I am reminded by counsel for intervener, that the rule followed by the master is much narrower than that established by the supreme court of this state in Harrison v. Smith, 83 Mo. 210. I was aware of that decision when I wrote the opinion in Bank v. Latimer. But, as is frequently done by courts of correlative jurisdiction, when they cannot agree with another court, I deemed it respectful to make no reference to a different ruling to avoid any seeming spirit of criticism. But, as the attention of the court is now invited to the position of the supreme court of the state on this question, it is proper to meet it. That court, in Mills v. Post, 76 Mo. 427, had denied the right of the cestui que trust to pursue his fund when it had become so mingled with the other moneys or property of a wrongful trustee that it was incapable of identification and separation. Then, in the case of Harrison v. Smith, supra, to make amends for its restriction of the rule far short of the recognized current of authority, both English and American, it swung to the very opposite extreme, and asserted the broad proposition that, although no part of the trust fund had passed to the hands of the assignee of the insolvent bank, either in kind or confused with other goods or property, yet, inasmuch as it had been applied by the bank, while it was a going concern, to uses and benefits of the bank, the wronged cestui que trust should be admitted to a preference out of the general assets in the hands of the assignee, on the theory that the general condition of the bank had been ameliorated by the former use and application of the plaintiff's money. The learned judge who wrote that opinion relied for the conclusion reached by him upon the case of Knatchbull v. Hallett, 13 Ch. Div. 696. This case is perhaps the most celebrated on this subject to be found in England or America. It is the recognized authority in this jurisdiction, because it has been directly approved by the supreme court of the United States. It is no authority for the advanced position taken by the supreme court of this state. It carried the rule in question no further than that stated by Mr. Justice Bradley in Frelinghuysen v. Nugent. In that case the beneficiary was pursuing the proceeds of his property, in equity, which had been wrongfully mingled with the other property of the trustee, and passed on his death en masse into the hands of his executor. The master of the rolls (Jessel) distinctly said, in his opinion:

"It is not disputed that the money remained at his banker's mixed with his own money at the time of his death; that is, he had not drawn out that money from his banker's."

Further on, he distinctly announced that:

"If he [the trustee] destroys a trust fund by dissipating it altogether, there remains nothing to be the subject of the trust. But, so long as the trust property can be traced, and followed into other property into which it has been converted, that remains subject to the trust."

That this is the generally recognized rule both of the English and American courts today, with few exceptions, the authorities abundantly establish. In Burnham v. Barth, 89 Wis. 362, 62 N. W. 96, it is held that a cestui que trust, in order to regain a trust fund out of the estate of a defaulting or insolvent trustee, must trace it and identify it, or the specific property into which it was converted, into the hands of the assignee or receiver of the estate. In Re Lebanon Trust & Safe Deposit Bank's Estate, 166 Pa. St. 622, 31 Atl. 334, and Appeal of Carmany, Id., it is held that where a bank, a trustee, merely placed the trust property in its general funds, and did not invest it in any of its securities, and such money is not capable of being traced on the insolvency of the bank, a claim against the bank's assignee for the amount of the trust fund is not entitled to preference. In Muhlenberg v. Trust Co. (Or.) 38 Pac. 932, it is held that a trust creditor, claiming a lien on funds in the hands of the receiver, must show that the funds sought to be charged include the trust fund. Likewise, in Henika v. Heinemann (Wis.) 63 N. W. 1047, it is distinctly held that, where the complainant consigned merchandise for sale to a firm, he cannot recover the proceeds thereof against the receiver of the firm where the funds could not be followed into any property or money which came into the hands of the receiver. The supreme court of Mississippi, in Shields v. Thomas, 14 South. 84, discusses this question with marked ability and satisfaction, recalling the foundation stone upon which the doctrine in question is builded. In that case the sheriff of a county, without authority, deposited in bank taxes collected by him with the knowledge of the bank. The bank failing, a receiver was appointed. The cash that came into his hands was less than the amount of such fund, and, it not appearing that the fund or any part of it came into the receiver's hands, either in its original form or as a part of the mass of the assets of the bank, it was held that such claim could not be made a charge on the general assets in the hands of the receiver, with precedence over the claims of other creditors of the bank. This is in accordance with the texts laid down by Perry, Trusts, §§ 836–841, 843, and in 2 Pom. Eq. Jur. §§ 1048–1058, which recognize the true rule to be that the beneficiary must be able to follow and identify the corpus of the trust fund, or the thing into which it had been converted, or he must show that the fund exists as a part of the mass of the trustee's property.

In the case at bar, the master's finding is that the money arising from the sale of the cattle was paid out to other creditors of the company, or dissipated by it, with the exception of $121.27, which is accorded to the intervener. Not $1 of the fund passed into or went to create any asset turned over to the receiver. Any general creditor of the company has more reason and right, in conscience, than the intervener, to claim that, as to the general assets, the moneys

loaned or cattle sold by him to the company contributed to their creation, and that, in pursuing this general fund, the intervener is not seeking to recover his own property within the meaning of the rule. While the wrongful act of the Campbell Commission Company is most reprehensible, and the claim of the intervener evokes the sympathy of the court, it is unable to afford him greater relief than that given him by the master without yielding its convictions as to the law of the case.

It results that the exceptions are overruled.